**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SEAN WALLACE, | : | Civil Action No. 09-4494 (ES) |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| LARRY GLOVER, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**Salas**, District Judge:

Petitioner Sean Wallace ("Petitioner") filed a petition for a writ of habeas corpus ("Petition"), pursuant to 28 U.S.C. § 2254(a), challenging a judgment of conviction rendered by the Superior Court of New Jersey. (D.E. No. 1, Petition for Writ of Habeas Corpus ("Pet.")). Petitioner was provided with Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000) notice, and Respondents were directed to file their answer to the Petition. (D.E. Nos. 2, 5). Respondents duly complied. (D.E. No. 9, Response to Petition for Writ of Habeas Corpus ("Resp. to Pet.") at 20). Petitioner elected not to traverse. For the reasons expressed below, this Court will dismiss the Petition and will decline to issue a certificate of appealability. See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.   BACKGROUND

Petitioner's legal challenges, while numerous, raise issues that are not complex. In contrast, the factual underpinnings of Petitioner's challenges are as dense as they are convoluted.

The Court, therefore, finds it prudent to begin this Opinion with a detailed discussion of the relevant factual matter.

The events underlying Petitioner's conviction began to unfold during late evening/night of January 6, 2003, and involved an armed robbery of Miguel Valente Tursty ("Tursty"). (Ex., D.E. No. 9-1 at 4); see also State v. Wallace ("Wallace-I"), No. A-6260-03T4, 2005 WL 3676807, at *1 (N.J. Super. Ct. App. Div. Jan. 19, 2006).

The record accumulated during Petitioner's trial established that, on that evening, Tursty was invited by Petitioner, whom Tursty knew and presumed to be Tursty's friend, and by two Petitioner's acquaintances, Orlando Richardson ("Richardson") and Zachary Elhamri ("Elhamri"), to visit a certain apartment complex in South Brunswick, New Jersey. Wallace-I, 2005 WL 3676807, at *1. Tursty accepted the invitation and stopped by at Red Roof Inn, located, too, in South Brunswick, in order to pick up Tursty's girlfriend, who was to accompany Tursty for this outing. Id. When Tursty went with Petitioner, Richardson and Elhamri into the apartment complex, Petitioner "robbed Tursty at gunpoint, taking one-hundred dollars," i.e., the entirety of funds Tursty had on him.[1] Id. During the robbery, Elhamri "hit Tursty in the head with a gun, causing Tursty's ear to swell," while Richardson participated by threatening to "shoot Tursty in the foot," apparently to supply the threat element to the statement Petitioner made to Tursty, i.e., "[W]e come here for the money." Id.

Thereafter, Elhamri and Petitioner,

brandishing guns, along with Richardson, forced Tursty to travel with them by car to a Red Roof Inn, where Tursty and his girlfriend had taken a room, "in order to obtain additional money." Threats were uttered by Richardson during the course of the ride. After Tursty unsuccessfully attempted to contact a friend allegedly

---

[1] Alternative testimony in the record suggested that the amount was $102.

2

possessing cash named Jean Carlos Abreu [("Abreu"), who was lodging] in an adjoining room [in the Red Roof Inn], Tursty was taken from the [Red Roof Inn] back to the car . . . being driven by Richardson for some distance with [Elhamri and Petitioner's] guns held to his sides, [but] he was returned to the [Red Roof Inn] following receipt of a call from Abreu [to] Tursty [indicating that Abreu was willing to assist Tursty].

Id. at *2.

Upon returning to the Red Roof Inn, "Richardson remained in the car, while [Elhamri and Petitioner] accompanied Tursty to his [and Julie's] room."  Id.  There, they were met by Abreu who was awaiting for Tursty.  Id.  At that point, Elhamri and Abreu "scuffled over a gun."  Id.  At the end of that scuffle, Elhamri and Petitioner ran to the car, where Richardson was awaiting for them, and the three drove away.  Id.

Police officers, who had been summoned to the Red Roof Inn, "spotted and pursued the vehicle" in which Richardson, Elhamri and Petitioner were trying to escape.  Id.  However, by the time the police officers succeeded at stopping the car, it contained only Richardson and Elhamri.  Id.  "No weapons or money were found in the car.  An abandoned gun [was] found elsewhere by the police [but it] was not dispositively linked to the crime or its participants" since no ballistic expertise was applicable due to no shooting.  Id.  "Tracks in the snow" from the car in which Elhamri and Richardson were apprehended "led the police to a gas station, where they were informed that a man had just left in a cab."  Id.  After a week of police investigation, Petitioner was identified and arrested.  Id.  During his trial, Petitioner maintained that, at the time of the aforesaid events, he was "at a recording studio in Brooklyn" and "knew nothing" about the offense.  Id.

3

In addition, during the course of his trial, Petitioner maintained that he did not know either Tursty or any other person involved in the events: he kept denying Tursty and all other witnesses' testimonies that they all actually knew Petitioner and that he was known to them under a nick-name which they pronounced as "Bubalis"; he maintained that his only nick-name was "Fabulous" and that he had used this "Fabulous" nick-name for the nine years preceding the events at issue.  (Exs., D.E. Nos. 9-3, 9-4) (replicating the same document); see also State v. Wallace ("Wallace-II"), No. A-1601-07T4, 2009 WL 790527, at *1-2 (N.J. Super. Ct. App. Div. Mar. 17, 2009).  Petitioner also testified "that he had never driven a[ny] motor vehicle except for one test drive in Brooklyn, and that he had never owned a car."  Wallace-II, 2009 WL 790527, at *2.

Following a jury trial, Petitioner was convicted of an armed robbery, conspiracy to commit a robbery, aggravated assault, possession of a handgun for an unlawful purpose, unlawful possession of a handgun, criminal restraint, and resisting arrest.  Wallace-I, 2005 WL 3676807, at *1.

On direct appeal, Petitioner's appellate counsel raised six various grounds, and Petitioner submitted his pro se brief, asserting that his trial counsel, William Fetky ("Fetky"), was ineffective by failing to provide him with a Jamaican-English interpreter; no other challenges against Fetky's performance were mounted during that direct appeal.[2]  Id. at *2-3.  Following the

---

[2] There is no such thing as official "Jamaican" language.  See https://www.cia.gov/library/ publications/the-world-factbook/geos/jm.html (clarifying that Jamaican population speaks "Jamaican English" and/or "English patois").  "Jamaican English" could be defined as a mix between American English and British English, with predominance of British English spellings.  See ANDREA SAND, LINGUISTIC VARIATION IN JAMAICA (1999). "Jamaican Patois," formally known as "Jamaican Creole," presents a mix of English and African terms.  See LARS HINRICHS, CODESWITCHING ON THE WEB: ENGLISH AND JAMAICAN CREOLE IN E-MAIL COMMUNICATION (2006). Standard British English is used as Jamaica's official language, and the bulk of written materials, official and not, is produced also in standard British English.  See id.

4

Appellate Division's affirmance of Petitioner's conviction and sentence, id. at *5, Petitioner initiated post-conviction relief ("PCR") proceedings.   Wallace-II, 2009 WL 790527, at *1. While Petitioner's PCR application raised numerous challenges to Fetky's performance, the key point of these challenges was that Fetky failed to investigate and present what Petitioner maintained was his alibi.  Id. at *2.  These PCR proceedings: (a) resulted in evidentiary hearings; and (b) yielded denial of Petitioner's PCR application.  Id. at *1.

Perhaps in light of both oddity and factual incoherence of Petitioner's PCR position, the Appellate Division's decision in Wallace-II was drafted in such a fashion that the factual pattern relevant to these PCR hearings is somewhat hard to follow.  Therefore, this Court finds it useful to systemize, below, the PCR facts detailed in the Appellate Division's opinion.

**A.      Statements About the Alibi Issue Made During Petitioner's Trial**

The initial issue of alibi defense was briefly touched during Petitioner's trial, when Petitioner testified that, on the night at issue, he was in Brooklyn, at a recording studio.  "After a side-bar conference during which [Fetky] stated that he had not asserted an alibi defense and that no alibi witnesses had been identified, the prosecutor cross-examined [Petitioner] with respect to differences between [Petitioner's] statement to the police and the testimony that he had just provided regarding his presence at the recording studio."   Id. at *2.   In response, Petitioner asserted that – even though he was advised by the police that he was being charged with an armed robbery committed during at the first minutes of January 7 – Petitioner did not make any statement to police about his alibi because, in his opinion, the police officer interrogating him asked about his whereabouts in the terms that Petitioner considered generic, rather than asking

5

him about his whereabouts during certain specific hours of the January-6-to-January-7 night.  Id. at *2-3

### B.     Kampf's Testimony During the PCR Hearings

As noted supra, the alibi issue resurfaced when Petitioner filed his PCR application.  In that application, Petitioner alleged that he spent the evening and night at issue with a certain Dawn Kampf ("Kampf"), and Kampf could have been his alibi witness whose testimony Fetky failed to investigate and present during Petitioner's trial.  Id. at *3.  An evidentiary hearing resulted, during which Kampf testified that she resided in Somerset, New Jersey, and – at the time of the events at issue – "had an intimate relationship" with Petitioner.  See id.  She also testified that, on January 6, 2003, Petitioner "called her, suggesting that she meet him in New York," and she agreed, "arriving at Penn Station in New York at approximately 4:00 p.m., where she was met by [Petitioner] who drove her in his jeep to the Don Juan Studios."  Id.  Kampf testified that, there, she and Petitioner "met Barrington McCain," whom Petitioner introduced to her as his "best friend," and "the studio's owner, Don Moody, as well as a number of other persons whose names Kampf could not recall."  Id.  She also testified that, at midnight, Petitioner drove her in his jeep "to Africa House, a club, where they remained until 4:00 a.m."  Id.  In addition, she testified that, after the club, Petitioner drove her "in his jeep to [an] apartment in Brooklyn," where they spent the remainder of the night together "until early afternoon."  Id.  She also testified that, upon conclusion of that rendezvous, Petitioner drove her "back to Penn Station, and she returned to New Jersey."  Id.

She continued by testifying that, approximately one week after the robbery had occurred, she was informed that Petitioner was arrested and, consequently, spoke to Petitioner's sister,

"who was trying to raise bail money, and then to [Petitioner's] mother, who informed Kampf of the [specific] date of the incident." Id. at *4.  According to Kampf, she "stated to the mother that [Petitioner] was with Kampf at the time, and the mother responded that Kampf would be contacted by . . . Fetky," whom Kampf apparently knew as a result of a prior legal action: because Kampf herself had a criminal record. Id.  Knowing that Petitioner was being prosecuted for a serious offense and being well familiar with Fetky, Kampf nonetheless did not contact Fetky regarding Petitioner's alleged alibi: she maintained she was simply awaiting for Fetky to call her. Id.  Asked, during Petitioner PCR proceedings, why she had not called Fetky herself, she responded, "Well, because I didn't really know what was going on with the case, and [Petitioner] and I had gotten into a big argument, so I was [waiting for] somebody . . . to send me something in the mail or, you know, contact me in some kind of way, and nobody ever did.  I didn't know if they needed me or not." Id.  Being asked about that "big argument" between her and Petitioner, Kampf testified that this dispute arose when the woman with whom Petitioner had a daughter allegedly learned about Petitioner's relationship with Kampf, and it somehow caused a dispute between Petitioner and Kampf "on [the] Memorial Day." Id.  In her testimony, Kampf did not explain her inaction during the four-month period, which took place between her learning that Petitioner was charged with an armed robbery and her alleged Memorial Day "big argument" with Petitioner. Id.

Being told that Petitioner's alleged "best friend," Barrington McCain, also did not even attempt to inform anyone about Petitioner's alleged alibi, and asked why she did not step forward with her information, Kampf stated, "[W]hen you're not from this country, . . . you don't want to

get involved in legal matters."[3]  Id.  During Kampf's testimony, it came out that Petitioner was released on pre-trial bail and remained out of custody for six and a half months (until being rearrested for failure to appear in court for a scheduled hearing), and that Kampf met with him seven or eight times, but, apparently, at no time Petitioner took her to Fetky so she would provide him with an alibi statement.  Id.

### C.   Petitioner's Mother's Testimony During the PCR Hearings

Petitioner's mother, Yvonne Meyers ("Meyers"), testified during Petitioner's PCR hearings that she did not have "direct knowledge" of Petitioner's alibi, but stated that she was told by *Petitioner* that "at the time of the crime, he was in New York with Kampf."[4]  Id. However, even though Meyers frequently met and talked to Fetky during Fetky's preparation for Petitioner's trial, Meyers never even mentioned to Fetky the fact that Petitioner, allegedly, had an alibi.  Id.

### D.   Petitioner's Testimony During the PCR Hearings

Petitioner, too, testified at his PCR hearings.  Id.  Unlike during his trial, Petitioner "conceded that he had been known" by a nick-name other than "Fabulous": at his PCR hearings, he alleged that he was also known under the nick-name sounding like "Bubbleous."[5]  Id.

---

[3] Neither McCain nor Moody's testimony was proffered during Petitioner's PCR.  This Court was unable to locate, in the massive transcripts of Petitioner's proceedings, any statement suggesting that McCain and/or Moody were "foreigners," either in the sense of being foreign-born and duly naturalized (or holding legal alien status) or even in the sense of being illegal aliens.

[4]  That statement was inconsistent with Kampf's testimony that Kampf, rather than Petitioner, informed Meyers of Petitioner's alibi.

[5] The Court was unable to locate, in Petitioner's transcripts, any statement by Petitioner or State witnesses suggesting that Petitioner actually spelled his nick-name to State witnesses (indeed, Petitioner asserted that he did not even know State witnesses at all).  Moreover, since  only the phonetics of Petitioner's nick-name were used in Petitioner's street interactions, some witnesses testified that they understood it as sounding as "Bubalis" while others understood it as sounding as "Boboloo."  (Ex., D.E. No. 17-1 at 1) (testimony of Abreu).  Therefore, it is not entirely clear as to how substantially the phonetics of "Bubalis" (i.e., the pronunciation utilized by the State) differ from phonetics of "Bubbleous" (i.e., the pronunciation utilized by Petitioner).

However, he maintained that he had changed his name to "Fabulous" in 2000, that is, about two years prior to the robbery, when he concluded that "Bubbleous" was a nick-name "too commonly used" and inconsistent with Petitioner's intent to stress his individuality, which – he felt – would have been emphasized far better by his use of the nick-name "Fabulous."  Id.

In addition, addressing the inconsistency between his own trial testimony (to the effect that he never drove any car, except for a single test-drive, and that he never owned any car) and the testimony provided by his alleged alibi witness, Kampf (regarding his extensive driving of her on January 6 and January 7, and regarding his car ownership of a jeep), Petitioner stated that his trial testimony was merely meant to indicate that he had a permit to drive a vehicle, rather than a driving license, and – although he did actually own an Isuzu SUV – that vehicle was somehow registered by a certain friend.  Id. at *2, *4.

Moreover, during his PCR hearings, Petitioner alleged that, on the night of the robbery, he took Kampf to spend the night in the Brooklyn apartment where the mother of his daughter resided, but he did not elaborate on whether the mother of his daughter was present at that apartment during the night at issue and what her reaction was to the fact of Petitioner's bringing his new girlfriend to that apartment to spend the January-6-to-January-7 night (even though Kampf testified that her alleged Memorial Day "big argument" with Petitioner occurred exactly because the mother of Petitioner' daughter reacted explosively when she eventually found out that Petitioner was having an intimate relationship with Kampf).  Id. at *4.

### E.      <u>Fetky's Testimony During the PCR Hearings</u>

Fetky, too, testified during Petitioner's PCR hearings.[6]  <u>Id.</u> at *5.  He stated that, "as a matter of [his] standard practice," he discussed with all his clients, Petitioner included, each potential defense available to all criminal defendants, including the alibi defense.  <u>Id.</u>  Fetky recalled that Petitioner had indicated that "at the time of this incident, he was at a recording studio somewhere."  However, Fetky testified that he was "never able to substantiate the alibi." <u>Id.</u>  Petitioner's PCR attorney, questioned Fetky as follows: "In this case, did, to the best of your memory, [Petitioner] ever bring you, to your office, anybody whom he described as someone who could provide an alibi for him?"  <u>Id.</u>  In response, Fetky stated: "I don't recall that happening.  All I can say is that if I had a viable alibi defense in this matter or in any other matter, I can not [sic] conceive of any reason why I wouldn't follow it up.  I just can't . . . . I just don't know why I wouldn't follow that up."  <u>Id.</u>  Fetky also testified that, had Petitioner had given him even only a name of the person who could have served as a viable alibi witness, Fetky would have "absolutely" investigated such lead and every bit of information ensuing from such lead.  <u>Id.</u> at *6.  Specifically, Fetky stated: "If Dawn Kampf ever contacted me or [even if her name] was provided to me and [I would have been informed that she] was able to testify in [Petitioner's] trial that she was with [Petitioner] on the night of this incident, I can not [sic] conceive of any reason on this planet why I would not call her [as Petitioner's defense witness]." <u>Id.</u>  Fetky also confirmed that Petitioner's mother never provided him with any hint about the alibi or even with a statement suggesting existence of any alibi.  <u>Id.</u>  Fetky's file composed in

---

[6] Because Fetky, being a pool attorney rather than a permanently State-employed public defender, had to return his file to the Public Defender's office at the conclusion of Petitioner's trial, his testimony was based solely on his recollection.

connection with Petitioner's defense was produced and examined; that examination confirmed that no notice of alibi had been filed by Fetky.  Id.

### F.   Petitioner's Other Testimony During the PCR Hearings

In contrast, during his PCR hearings, Petitioner kept maintaining that he "had discussed his alibi with Fetky, eventually identifying Kampf, McCain and Moody as persons who could confirm it, and providing the telephone numbers for Kampf and Moody."  Id. at *5.  Petitioner also testified during his PCR hearings that, when he was released from jail on bail, he states to both Kampf and Moody that "they would be contacted by Fetky," but he conceded that he "did nothing more to insure that the statements of those witnesses or of other persons present at the studio would be taken."  Id.  Petitioner claimed that, initially, he was unable to utilize the telephone at the jail "to contact the people present at the studio" because the jail telephone was "blocked."  Id.  He, however, failed to explain why he did not telephone or personally contact them after he made bail and remain at large for many months.  Id.

According to Petitioner, he had a "very rocky relationship" with Fetky, and so Petitioner claimed that Fetky was just "brushing" Petitioner off when he was attempting to discuss his alibi; in connection with that assertion, Petitioner alleged that Fetky was, generally, refusing to communicate with him.[7]  Id.  Being confronted with Fetky's time sheets, which showed eight pre-trial conferences between Fetky and Petitioner, Petitioner responded by stating that Fetky was "refus[ing] to listen" to Petitioner's evidence regarding his alibi.  Id.

Since the version of events asserted by Petitioner on PCR was ridden with a multitude of logical flaws, he was asked during his PCR hearings: "You were out on bail for quite a while.

---

[7] Petitioner did not explain why, having such a "rocky relationship" with Fetky, he nonetheless did not make an application to the State's Office of Public Defender to have another counsel assigned in place of Fetky during the

Did you ever go get any of these people and drag them over to Mr. Fetky's office and [at least]

show them to him?" Id.  To that Petitioner responded that he did not, explaining his absolute

lack of action with the puzzling statement, "People in New York, they don't really like New

Jersey." Id.  Then, elaborating on his failure to bring Kampf to Fetky's office, Petitioner stated

that, first, he did not ask Kampf to contact Fetky because he had a fight with Kampf in January

(rather than on Memorial day, as Kampf claimed), all while he was still in jail, pre-bail, and after

his release on bail, he elected to avoid contacting Kampf because, at that time, she was already

dating another man, and Petitioner "did not wish to cause [her] a problem" or, in alternative,

because "she had gone to Canada." Id.[8]

### G.     PCR Judge's Findings as to Kampf's Testimony

At the conclusion of the above-detailed PCR hearing, the state judge summarized the

evidence provided by Kampf and observed:

> I don't find her testimony to be credible at all. . . . [B]asically[,] her demeanor was
> that this was sort of a joke, that she was here to testify, and she kept on saying, I
> guess, I guess, and her story is just not credible. It's preposterous.  By that I mean
> here's a woman who knows the criminal justice system [because she had been
> found guilty of the offense of passing bad checks, and she herself received a
> probationary sentence].  She's a mature woman in her 40s, and she has crucial
> information allegedly about her lover being charged with an armed robbery, and
> she never ever goes to see Mr. Fetky, never ever calls Mr. Fetky, and she knows
> who Mr. Fetky is.  She could even look him up in the phone book, William Fetky,
> Kirkpatrick Street, New Brunswick.  And then conveniently she gets into a spitty-
> spat with [Petitioner], so that's an excuse for her not to talk to him so he can tell
> her, go see Mr. Fetky.  It's just totally preposterous testimony.

---

many months of preparation for the trial.

[8] The Court notes, in passing, that Petitioner's statements to that effect are hard to reconcile with the relevant
Kampf's statements, since: (a) Kampf at no point asserted that she was unavailable due to her being in Canada
(indeed, she did not state she was in Canada altogether); (b) it is unclear why Petitioner was concerned about
"causing a problem" to Kampf by asking her to meet with Fetky if Petitioner was meeting with Kampf seven or eight
times for other reasons during the period when Kampf, allegedly, was dating another man; and (c) it is equally
unclear why the mother of Petitioner's child had a reaction during the Memorial Day holiday if Kampf was already
involved with another man.

<u>Id.</u> at *6.

**H.     <u>Other Findings Made by the PCR Judge</u>**

The PCR judge also did not find credible the testimony of Petitioner's mother when the judge addressed her statement that, despite her knowledge of her son's alibi, she still elected to never even mention that alibi to Fetky.   <u>Id.</u>   Then, turning to Petitioner's PCR testimony, the judge found it "totally incredible."   <u>Id.</u>   Specifically, the judge noted multiple substantive inconsistencies between Petitioner's trial and PCR testimonies and concluded that the version of events proffered by Petitioner during his PCR was wholly unbelievable.   <u>Id.</u>   In contrast, the PCR judge found Fetky's testimony credible.   The PCR judge ruled:

> I find in this post-conviction relief [matter] that there's no ineffective assistance of counsel by Mr. Fetky . . . . [T]he mistake that [Petitioner] is saying was made in this case by Mr. Fetky would be a colossal series of mistakes bordering on not ineffective assistance of counsel, but bordering on criminality.   And it's totally incomprehensible, totally without basis, totally without fact.

<u>Id.</u>

Therefore, the PCR judge denied Petitioner relief, and the Appellate Division affirmed. <u>Id.</u> at *7.  Petitioner's applications for certification to the New Jersey Supreme Court were denied with respect to both his appellate and PCR proceedings.  <u>State v. Wallace</u>, 199 N.J. 544 (2009); <u>State v. Wallace</u>, 187 N.J. 80 (2006).  The instant habeas action followed.

**II.     <u>PETITIONER'S CHALLENGES</u>**

**A.     <u>Grounds Raised</u>**

Petitioner raised the following grounds in his instant Petition:

GROUND ONE:      The trial court erred in denying [Petitioner's] motions for acquittal judgment notwithstanding the verdict.

13

GROUND TWO:       The trial court erred in refusing to grant [Petitioner] a new trial after detective Varga told the jury that [Petitioner] had been arrested at the courthouse on a separate charge.

GROUND THREE:     The trial court erred in charging <u>sua</u> <u>sponte</u> second-degree robbery.

GROUND FOUR:      The prosecutor's comments during trial denied [Petitioner] a fair trial.

GROUND FIVE:      The trial court infringed upon [Petitioner's] right to cross-examination.

GROUND SIX:       The failure of [Petitioner's] counsel to provide an interpreter during trial and the failure of the court to assure the presence of an interpreter denied [Petitioner] a fair trial in violation of the U.S. Const[itution], and N.J. Const[itution]. . . .

GROUND SEVEN:     [Petitioner] received [in]effective assistance of counsel.[9]

(Pet. 18-19).

**B.**     **Exhaustion**

Petitioner asserts that all his Grounds were duly exhausted in state courts for the purposes of this Court's federal habeas review.  This is incorrect.

A state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[] the remedies available in the courts of the State," unless "there is an absence of available State corrective process[] or . . . circumstances exist that render such process ineffective."  28 U.S.C. § 2254(b)(1); <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982); <u>Toulson v. Beyer</u>, 987 F.2d 984, 987 (3d Cir. 1993); <u>Duarte v. Hershberger</u>, 947 F. Supp. 146 (D.N.J. 1996); <u>see also</u> <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513 (3d Cir. 1997), <u>cert. denied</u>, 532 U.S. 919 (2001) (finding that

---

[9] Ground Seven raised five different sub-claims, each qualifying as a separate Ground and, hence, effectively raising the total number of Petitioner's Grounds to eleven.

"Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts").   The courts of a state must be afforded an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Wilwording v. Swenson, 404 U.S. 249, 250 (1971); Picard v. Connor, 404 U.S. 270, 275 (1971); Evans v. Court of Common Pleas, Del. Cnty., Pa., 959 F.2d 1227, 1230 (3d Cir. 1992), cert. dismissed, 506 U.S. 1089 (1993).   Exhaustion is not a jurisdictional requirement; rather, it is designed to allow state courts the first opportunity to pass upon federal constitutional claims, in furtherance of the policies of comity and federalism.   See Granberry v. Greer, 481 U.S. 129 (1987); Rose, 455 U.S. at 516-18; Evans, 959 F.2d at 1230; O'Halloran v. Ryan, 835 F.2d 506, 509 (3d Cir. 1987).   Exhaustion also has the practical effect of permitting development of a complete factual record in state court, to aid the federal courts in their review.   See Rose, 455 U.S. at 519; Castille v. Peoples, 489 U.S. 346, 349 (1989).

A petitioner must exhaust state remedies by presenting his *federal* constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in post-conviction proceedings.   See Ross v. Petsock, 868 F.2d 639 (3d Cir. 1989); see also O'Sullivan v. Boerckel, 526 U.S. 838 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented").   Only if a petitioner's *federal* claims have been fairly presented to the state's highest

15

court, the exhaustion requirement is satisfied.  See Picard, 404 U.S. at 275; Castille, 489 U.S. at

350.  The petitioner generally bears the burden to prove all facts establishing exhaustion.  See

Toulson, 987 F.2d at 987.  This means that the claims heard by the state courts must be the

"substantial equivalent" of the claims asserted in the federal habeas petition.  Picard, 404 U.S. at

275.  Reliance on the same constitutional provision is not sufficient; *the legal theory and factual*

*predicate must also be the same*.  See id. at 277 (emphasis added).  Where any available

procedure remains for the applicant to raise the question presented in the courts of the state, the

applicant has not exhausted the available remedies.  See 28 U.S.C. § 2254(c).  Federal courts

have consistently adhered to the exhaustion doctrine "for it would be unseemly in our dual

system of government for a federal district court to upset a state court conviction without an

opportunity to the state courts to correct a constitutional violation."  Picard, 404 U.S. at 275

(citations and internal quotation marks omitted).

Here, as Respondent points out – and as the record substantiates – the claims

corresponding to Petitioner's instant Grounds One, Two, Three and Four raised solely state law

challenges during Petitioner's state proceedings.  His Ground Five raised also only state law

challenges, but was reviewed by the Appellate Division on, inter alia, federal grounds.

Petitioner's Ground Six (the basis of which cannot be determined for the purposes of his appeal

to the Appellate Division due to loss of state records as to this part of his brief and the Appellate

Division's dismissal of that Ground without any elaboration) was withdrawn from Petitioner's

challenges presented for review by the Supreme Court of New Jersey, i.e., it too remained

unexhausted.  Thus, only Petitioner's Ground Seven was properly raised before all three levels of

state court and asserted federal grounds.

16

Hence, the Petition is subject to dismissal as a "mixed" petition (or Petitioner should be allowed to withdraw all his grounds except Grounds Five and Seven). However, under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." See also Lambert, 134 F.3d at 515 (district court may deny an unexhausted petition on the merits under § 2254(b)(2) "if it is perfectly clear that the applicant does not raise even a colorable federal claim").

Since, here, it is apparent from the face of the Petition and the record docketed in this matter that each of Petitioner's above-quoted seven Grounds does not raise even a colorable federal claim, the Court finds it warranted to address the merits of Petitioner's claims and dismiss them under its § 2254(b)(2) power.

## III.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen Cnty. Prob. Dep't, 128 F.3d 152,

159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71 (3d Cir. 1985).

A district court must give deference to determinations of state courts. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Del. Corr. Ctr., 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits"[10] in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

---

[10] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)), rev'd on other grounds Rompilla v. Beard, 545 U.S. 374 (2005). A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever. Rompilla, 355 F.3d at 247.

18

(2)      resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is contrary to a Supreme Court holding if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable. Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

## IV. DISCUSSION

### A.      Ground One – Denial of Judgment of Acquittal

In his Ground One, Petitioner asserts that his "trial court erred in denying [Petitioner's] motions for acquittal judgment notwithstanding the verdict." (Pet. 17). Petitioner maintains that,

19

because the evidence submitted during his trial was "largely circumstantial,"[11] and because testimonies of State witnesses were incoherent in some peripheral respects, "the State's proofs were insufficient to sustain [Petitioner's] convictions." Id.

A claim that the verdict is against the weight of the evidence is essentially a matter of state law, and does not raise a federal constitutional question unless the record *is completely devoid of evidentiary support* of the inmate's guilt.[12] See Cunningham v. Maroney, 397 F.2d 724, 725 (3d Cir. 1968), cert. denied, 393 U.S. 1045 (1969) (emphasis added). Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt should a writ be issued. See Jackson v. Virginia, 443 U.S. 307, 324 (1979); Singer v. Court of Common Pleas, Bucks Cnty., 879 F.2d 1203, 1206 (3d Cir. 1989). Factual issues determined by a state court (jurors included) are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

Here, the record is heavily laden with evidence of Petitioner's guilt. Conversely, Petitioner fails to offer the Court any evidence – and, certainly, he offers no clear and convincing evidence – that any reasonable triers of fact would be unable to find Petitioner guilty on the basis

---

[11] This Court is not entirely clear as to the basis for Petitioner's argument that Tursty's testimony and other eye-witnesses' testimonies of Petitioner robbing Tirsty at gunpoint qualify as "circumstantial." Since, under the law of evidence, such testimonies qualify as direct evidence, the Court presumes Petitioner was merely aiming to assert that Petitioner was inviting the Court to find this evidence insufficiently credible. However, all factual findings made at state courts, be they with regard to actual events, as occurred, or with regard to credibility of witness testimony, can be called into question on habeas review only by the petitioner offering clear and convincing evidence to the contrary. See Stevens, 295 F.3d at 368. Moreover, the Court sitting in habeas review is limited to consideration of the record that was before the state court which adjudicated the claim on the merits and, thus, cannot expand the record. See Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398-1401 (2011).

[12] Alternatively, a federal court may grant federal habeas relief where a state court's error in interpreting or applying state law was so erroneous that it rendered the trial fundamentally unfair within the meaning of due process guarantees. See McGuire, 502 U.S. at 67-68. However, as Respondent's answer details, no state provision or precedent was applied during Petitioner's proceedings in a fashion meriting, even remotely, a consideration of habeas relief. (D.E. No. 9 at 19-24) (detailing the state law aspects).

of the record presently before this Court.  All that Petitioner offers the Court is his self-serving assertion that the State's case against him was not flawless.  However, the Due Process Clause does not avail Petitioner to a perfect trial.  See Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986); see also Shelly v. Beyer, No. 87-969, 1988 U.S. Dist. LEXIS 17328, at *5 (D.N.J. Nov. 17, 1988) (state evidence proffered at trial are viewed in their entirety, regardless of whether they are direct or circumstantial); accord United States v. Miller, 688 F.2d 652, 662 (9th Cir. 1982) ("The distinction between direct evidence and circumstantial evidence no longer has any basis in law").  Hence, Petitioner's claims asserting wrongful denial of a verdict of acquittal or his entitlement to a conclusion that the jurors entered their decision against the weight of evidence are without merit and warrant no habeas relief.  Petitioner's Ground One will, therefore, be dismissed for not presenting even a colorable claim.

### B.      Ground Two – "Appeared for Court" Statement

In his Ground Two, Petitioner alleges that his "trial court erred in refusing to grant [Petitioner] a new trial after detective Varga told the jury that [Petitioner] had been arrested at the courthouse on a separate charge."  (Pet. 17).

The relevant trial facts were as follows: before Detective Varga's testimony (about his arrest of Petitioner), a side bar conference was held regarding Fetky's concerns that Varga would state that Petitioner was arrested in the courthouse (Fetky was concerned that the jury might presume, from that testimony, the fact that Petitioner had an additional criminal charge – unrelated to the cluster of charges ensuing from armed robbery of Tursty).  The prosecutor, accommodating Fetky's concerns, expressed willingness to try to question Varga in a fashion striving to omit identification of the locale where Petitioner was arrested.

> [Varga's] testimony [took place after that conference and] was as follows:
> Q.    Detective, was [Petitioner] arrested in New Brunswick at a later date?
> A.    He was. He appeared –
> Q.    Just –
> A.    He appeared for court in New Brunswick.
> Q.    You could say [just] "yes" or "no."
> A.    For our charge or for a separate charge?  He was –
> Q.    If you can just stop for one minute.   The question is was [Petitioner] arrested?
> A.    Yes.
>
> The court denied a mistrial, noting that any implication that [Petitioner] had committed a prior crime could be eliminated by asking [Petitioner], who was expected to testify, whether he had a prior record. [Indeed, Petitioner] did testify on his own behalf, and he denied any prior convictions.  Further, at the time of [Detective Varga's testimony, Fetky] specifically stated that he did not wish a curative instruction [noting his concern that belaboring this point might only cause additional undue inferences on the part of the jurors].

Wallace-I, 2005 WL 3676807, at *3.

The Appellate Division dismissed Plaintiff's claim that Detective Varga's comment should have resulted in mistrial, noting, "[i]n the circumstances, we find no reversible error.  The comment was brief [especially in comparison with 60 pages of Varga's testimony] and ambiguous at best, and any negative import was diluted by [Plaintiff's] unchallenged testimony that he lacked a prior record.  We thus find that it was not clearly capable of producing an unjust result warranting reversal."  Id. (internal citation omitted).

The Supreme Court explained, in a case also involving the denial of a motion for a mistrial that

> [i]t is important at the outset to define the question before us.  That question is not whether the trial judge should have declared a mistrial.  It is not even whether it was an abuse of discretion for [him/]her to have done so – the applicable standard on direct review.   The question under AEDPA is instead whether the determination of the [highest state court] that there was no abuse of discretion was "an unreasonable application of . . .  clearly established Federal law [relating to the underlying conduct]."  § 2254(d)(1).

22

Renico v. Lett, __ U.S.___, 130 S. Ct. 1855, 1862 (2010).

This Court, therefore, agrees with Petitioner's trial judge's determination that Detective Varga's slip-of-tongue statement that "[Petitioner] appeared for court in New Brunswick" was evidence admission which would not warrant mistrial.

"[F]ederal habeas corpus relief does not lie for errors of state law," Estelle v. McGuire, 502 U.S. 62, 67 (1991), such as evidentiary rulings, unless the rulings rendered the trial so fundamentally unfair that a denial of constitutional rights results.  The admission of evidence violates due process only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness.  However, courts "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37, 43 (1996).  Thus, unless Petitioner can demonstrate that the introduction of this evidence denied him his right to a fair trial or due process, habeas relief is not warranted.

Here, Petitioner's Ground Two invites this Court to grant him habeas relief on a technicality.  The Court declines this invitation: the fundamental fairness test, as detailed in Dowling and Egelhoff, focuses this Court's attention not on the technicality but on the overall fairness of Petitioner's proceedings.  Petitioner's Ground Two unduly tries to capitalize on an ambiguous statement with regard to which Petitioner declined curative instructions and, in addition, which – to the degree it could have prejudiced Petitioner – was fully neutralized by

23

Petitioner's testimony that he had no prior record.  In light of Petitioner's inability to even articulate – moreover establish – any actual prejudice, this Court will dismiss Petitioner's Ground Two as not presenting even a colorable claim.

### C.     Ground Three – *Sua Sponte* Charge of Second-Degree Robbery

In his Ground Three, Petitioner, being convicted of first-degree robbery, asserts that his trial court erred by also providing, sua sponte, the jurors with a charge of second-degree robbery (hence, allowing the jurors an opportunity to convict Petitioner of a lesser offense).

Generally, a jury instruction – even if it is inconsistent with state law – does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction . . . , we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."   "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle, 502 U.S. at 72-73 (citations omitted).

Thus, the Due Process Clause is violated only where the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law. See Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) (to prevail in a jury-instruction challenge, a petitioner must establish both that the instruction was ambiguous, inconsistent, or deficient, and that there is a reasonable likelihood that the jury applied the instruction in a

manner that relieved the state of its burden to prove every element of the crime beyond a reasonable doubt); In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Here, Petitioner complains of jury instructions which *highlighted* to the jurors the burden the State had to meet with regard to each element of the crime of which Petitioner was actually convicted (by charging the jury with both first-degree robbery and second-degree robbery and, hence, by providing a comparison between these two offenses). No due process violation could be fancied on the basis of such facts. Therefore, Petitioner's Ground Three will be dismissed for not presenting a colorable claim.

### D.    Ground Four – Prosecutorial Comments

Reflecting on Petitioner's Ground Four challenges, the Appellate Division observed:

[Petitioner] argues that prosecutorial misconduct occurred, consisting of the following: (1) characterizing the events as a "betrayal of friendship" in her opening statement; (2) . . . allegedly lowering the State's burden of proof by stating during closing that there was "no question that [Petitioner] and . . . Richardson's purpose along with [Elhamri] was to promote and facilitate the commission of that armed robbery"; and ([3]) inappropriately vouching in closing argument for . . . Abreu, a witness involved in the fighting that occurred at the [Red Roof Inn], by stating that Abreu had "no ax to grind" and "came here and . . . was honest. He told you exactly what happened."

We find none of these comments sufficient to warrant a retrial. The statement by the prosecutor in her opening that the events constituted a betrayal of friendship was premised on evidence to be presented that Tursty was a friend of at least two of his attackers and was thus proper. Her characterization in closing of defendant's purpose, although perhaps inartful, clearly related to the charge of conspiracy against him, and cannot reasonably have been interpreted by the jury as

diminishing the State's burden of proof.  While the prosecutor's statement with respect to the truthfulness of Abreu constituted impermissible vouching, no objection was raised to it at the time it was made.  In light of that fact, the brevity of the comment, and the overall unexceptionable nature of the prosecutor's closing, we do not find the remark so egregious as to have deprived defendant of a fair trial.

Wallace-I, 2005 WL 3676807, at *4 (citations omitted).

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).  The Supreme Court has explained that the proper standard of review to be applied in a federal habeas proceeding of allegedly improper prosecutorial statements during a criminal trial is "the narrow one of due process, and not the broad exercise of supervisory power."  Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974).  For a federal court to grant habeas relief it "is not enough that the prosecutors' remarks were undesirable or even universally condemned," rather the appropriate question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations & internal quotation omitted).  To demonstrate entitlement to habeas relief, the petitioner must show the prosecutor engaged in egregious misconduct.  See Smith v. Phillips, 455 U.S. 209, 221 (1982).  As the Court of Appeals explained, "improper conduct is not, in itself, sufficient to constitute constitutional error, even when . . . that conduct is alleged to be both deliberate and pervasive." Marshall v. Hendricks, 307 F.3d 36, 67 (3d Cir. 2002).  Rather, "[i]mproper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and

thus raise doubts as to the fairness of the trial."  Id.  Moreover, the concept of "fair response" allows a party to respond to statements made by opposing counsel.  See United States v. Robinson, 485 U.S. 25, 32 (1988).

Here, this Court agrees with the Appellate Division that the prosecutor's opening observation that the events presented by Petitioner's case were akin to a betrayal of friendship was proper in light of anticipated (and actually given) Tursty's testimony that he was a friend of at least two of his attackers and, hence, this statement could not have infected the trial with unfairness.   Analogously, this Court agrees with the Appellate Division's conclusion that the prosecutor's closing argument characterizing Petitioner's purpose was "although perhaps inartful, [but] clearly related to the charge of conspiracy against him."  Wallace-I, 2005 WL 3676807, at *4.  Thus, this statement also did not infect Petitioner's trial with unfairness.

Moreover, while the Court agrees with the Appellate Division's conclusion that the *language* of the prosecutor's comments vouching for Abreu were not ideal for the purposes of a criminal proceeding, this Court – unlike the Appellate Division – finds the *gist* of the prosecutor's statement permissible: because the prosecutor's statement presented a joint response to the attacks defense attorneys made on the credibility of State witnesses.[13]

---

[13] It appears that State witnesses were all (or mostly) Spanish-American, and the record clearly established that Abreu was giving his statements to police in Spanish.  During Abreu's cross-examination by Fetky, Fetky called Abreu's credibility in question by capitalizing on an inconsistency between the Spanish-to-English translation of the statement given by Abreu to the police and Abreu's in-court's testimony.   (D.E. No. 17-1 at 1-2).  Fetky's co-counsel mounted an even more direct attack on the credibility of State witnesses (and on the police reports made by those witnesses).  Specifically, Fetky's co-counsel stated:

> This past Friday . . . I started my day watching . . . the Good Morning America, . . . they have local news.  And the top story . . . was . . . , I think it was St. John's basketball players, and I guess they had been accused of some criminal activity or something in Pittsburgh, Pennsylvania.  And the story was, well, there was some investigation by the police, yadda-yadda-yadda.  And guess what?  They charged the girl with a false report.  And we're all familiar with the story of the lady, I think it was in Illinois, she said she had the Powerball or Mega jackpot, some kind of ticket, she had it. Ultimately that turned out to be a false police report.  Two false police reports. So I don't know if

Consequently, Petitioner's Ground Four will be dismissed for not presenting even a colorable claim.

### E.     Ground Five – Limitation on Cross-Examination

Reflecting on Petitioner's Ground Five challenges, the Appellate Division stated:

> We . . . find that it was within the court's discretion to instruct [Petitioner's] co-defendant's counsel to "move along" with cross-examination of . . . Tursty and to limit the length of that cross-examination.  The court's actions did not in the circumstance deprive either defendant of his Sixth Amendment rights.  The record reflects lengthy and unnecessary examination on issues such as the ownership of Tursty's cell phone, the identity of his phone service, legal responsibility for the bill, as well as extended examination on peripheral facts associated with the events at issue.  The court did not abuse its wide discretion in imposing reasonable limits on questions of this sort.  The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness, and may impose reasonable limits on cross-examination that is repetitive or only marginally relevant.  State v. Cuni, 303 N.J. Super. 584, 608 ([N.J. Super.] App. Div. 1997) (quoting Delaware v. VanArsdall, 475 U.S. 673, 679 (1986)) . . . .  Further, we find no evidence that co-counsel was precluded from exploring relevant areas of inquiry or advancing the defenses of either [Petitioner or his co-]defendant.

Wallace-I, 2005 WL 3676807, at *4.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. CONST. AMEND. VI.  The right is secured for defendants in state as well as federal criminal proceedings by the Fourteenth Amendment.  See Pointer v.

---

that has anything to do with this case, but this is the real world in which we live in.  The whole criminal justice system here is based upon and premised upon . . . credible testimony in court.  And how do you know if it's credible or not?  You don't really know . . . .  Now, [a State witness'] testimony could have been completely true, could have been completely false, or some – could have been somewhere in the middle.

(D.E. No. 18-1 at 6-7).  In light of the foregoing, it was reasonable for the prosecutor – responding to the totality of Fetky and Fetky's co-counsel's points calling credibility of State witnesses in question – to make a statement offsetting the prosecutor's comments, although this Court agrees with the Appellate Division's position that the quasi-vouching language selected by the prosecutor was not the best choice for the purposes of a criminal trial.

Texas, 380 U.S. at 403.  The protections of the Confrontation Clause necessarily include the right to cross-examination a witness.  See Smith v. Illinois, 390 U.S. 129, 131 (1968).  The scope of such cross-examination is, generally, broad and basic information cannot be excluded; for instance, where credibility is at issue, the trial court cannot ordinarily prohibit the defense from inquiring into a witness's identity and residence.  See id.  Such questions are "not only an appropriate preliminary to the cross-examination of the witness, but . . . [are] an essential step in identifying the witness with his environment, to which cross-examination may always be directed."  Id. at 132 (quoting Alford v. United States, 282 U.S. 687, 693 (1931)).  In other words, defense must be able "to make a record from which to argue [that the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."  Id.

However, the right to cross-examination is not without limits, as "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Thus, the scope of cross-examination regarding a particular line of inquiry falls necessarily "within the sound discretion of the trial court," and "it may exercise a reasonable judgment in determining when [a] subject is [inappropriate]."  Alford, 282 U.S. at 694.  "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant."  Van Arsdall, 475 U.S. at 679.

Here, Petitioner fails to assert any point potentially dispositive for Petitioner that was not elicited during cross-examination of State witnesses.  Rather, he asserts his mere dissatisfaction

with the fact that State witnesses did not remain on the stand for as long as Petitioner's co-defendant's counsel desired.  Specifically, Petitioner states:

> The trial court told co-defendant's counsel, during cross- examination of Tursty [that] were not going to do this all day . . . we're not going to have this man on cross-examination all day.  The court continually sustained "asked and answered" objections in an obvious attempt to shorten the cross- examination.  The trial court impugned counsel for co-defendant['s rights] by asking how many times does he get to tell you he does not know how long [a certain process] takes.  The trial court quested, in front of the jury, the relevance of why counsel was inquiring as to whether Tursty was wearing earrings on the night in question (which was relevant to whether he would have sustained more noticeable injury had he been struck on the ear with the gun as he claimed).

(Pet. 18).

Petitioner has no standing to assert claims of his co-defendant.  By the same token, Petitioner has no constitutional claim on the basis of his mere displeasure with his trial court's sustainment of the "asked and answered" objections (or with the trial court's aim to move along the proceedings).  Finally, the rationale of Petitioner's interest in having his co-defendant's counsel obtain a statement from Tursty as to whether or not Tursty was wearing earrings is facially meritless, since any admissible testimony as to the *comparative magnitude* of injury resulting from "a" victim's having of an earring during a "hit" on the victim's ear would require, at the very least, a medical expert's opinion correlating the exact location where the ear was allegedly hit (e.g., in the lobe or in the shell area) to the alleged location and alleged size/shape of the earring, and then to the magnitude of the alleged blow: to produce a comparative opinion as to the degree of swelling an average person of Tursy's age/gender/physical conditions could have suffered while wearing (and while not wearing) the so-located-and-so-shaped earring as a result of such particular blow.  However, neither Petitioner nor Petitioner's co-defendant had any

30

medical experts lined up for such testimony.[14]   In sum, all Petitioner asserts is that his co-defendant's co-counsel was prevented from conducting more fishing expeditions with the goal of exhausting either Tursty, or the jurors or the trial judge's patience.   However, limitations on fishing expeditions fall necessarily "within the sound discretion of the trial court," and it was a reasonable exercise of that discretion for Petitioner's trial judge to limit such expeditions. Alford, 282 U.S. at 694; see also Van Arsdall, 475 U.S. at 679.   Thus, Petitioner's Ground Five will be dismissed for not presenting even a colorable claim.

**F.      Grounds Six and Seven – Assistance of Counsel**

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.   See Strickland v. Washington, 466 U.S. 668, 687 (1984).   First, the petitioner must "show that counsel's representation fell below an objective standard of reasonableness," id. at 687-88;  "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.   And – even if the first prong of Strickland is met – the defendant must show that "there is a reasonable probability that, absent the errors, the fact[-]finder would have had a reasonable doubt respecting guilt."  Id. at 695.

Moreover, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689 (citations omitted); see also Virgin Islands v. Weatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

---

[14] In addition, there was alternative testimony suggesting that Tursty's ear was hit not with a gun but with a fist; however all sides agreed that the injury to Tursty's ear was relatively minor.

### 1.      Lack of Interpreter

Here, Petitioner's first challenge to Fetky's performance is based on Fetky's alleged failure to provide Petitioner with a Jamaican-English interpreter.  Specifically, Petitioner asserts that, "[b]ecause of [Petitioner's] Jamaican language barrier[,] an interpreter should have been provided to him.  [Petitioner now asserts that he] could not assist in his own defense because [Fetky] was unable to communicate with him."  (D.E. No. 1-1 at 20).

In response to this allegation, the Appellate Division observed:

[Petitioner's] argument that he required a Jamaican interpreter is raised for the first time on appeal.  Although he now claims that his native language is Jamaican and that he was unable to speak or understand English at the time of trial, it is clear from the transcript, including [Petitioner's] own testimony, that [Petitioner] possessed a good knowledge of English and a reasonable ability to communicate in that language.  [Petitioner] was articulate in his answers to the questions posed of him, and he never indicated on the record any difficulty in following what occurred at trial or in understanding defense counsel.

Wallace-I, 2005 WL 3676807, at *5.

Moreover, as Respondent observed (and as the record substantiates extensively),

[During his criminal trial, n]ot once did [Petitioner] ask to have a question explained or repeated.  Not once did he express an inability to answer the question in English.  Rather, the record shows that [P]etitioner understood and spoke English well enough to be able to communicate with Fetky.  Moreover, Fetky and [P]etitioner both testified at the PCR hearing. . . . [P]etitioner testified about the alibi that, according to him, Fetky did not investigate. [At all these instances,] Petitioner . . . testified without an interpreter, and, although the PCR hearing was three years after trial and [P]etitioner could have improved his English skills, . . . he [did not] testif[y during his PCR proceedings] that [he and Fetky] could not understand one another.

(Resp. to Pet. at 27).

In sum, the state courts found, as a factual matter, that Petitioner's English skills were sufficient to meaningfully participate in his defense.  Federal courts "must presume that the

factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens, 295 F.3d at 368; see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence) (citing U.S.C. § 2254(e)(1)).

Here, Petitioner offers the Court no clear and convincing evidence (or no evidence of any kind) that he could not communicate in English.  All he offers the Court is an invitation to disregard the record and accept Petitioner's conclusion as evidence.  That this Court cannot do. This Court finds it unwarranted to disturb the state courts' well-founded conclusion that Petitioner's English was fully sufficient for the purposes of his criminal prosecution.  Building on this fact, this Court finds that even the first prong of the Strickland test cannot be met by Petitioner: indeed, it was not below objective standards of reasonableness for Fetky to omit obtaining an interpreter for a client who already spoke sufficient English on his own.[15]  Hence, the Court need not reach the second prong of Strickland and will dismiss Petitioner's Ground Six as failing to amount to a colorable claim or, in alternative, because the Appellate Divisions' determinations was not an unreasonable application of Strickland and its progeny.[16]

## 2.    Failure to Investigate and Produce Kampf as an Alibi Witness

Largely, the same rationale drives this Court's analysis with regard to Petitioner's Ground Seven.

---

[15] See Pabon v. Mahanoy, 654 F.3d 385 (3d Cir. 2011) (holding that the litigant's inability to speak, read, or write English might be relevant to the *timeliness* aspect of a litigant's Section 2254 challenges, and even that relevance could exist only if the litigant was either denied all material in his/her native tongue or provided with the material or lingual assistance so minimal that it rendered the material/assistance de facto absent).

[16] As noted supra, Petitioner's Ground Six challenges were not raised at either the trial court level or to the Supreme Court of New Jersey.  Hence, this Ground, unexhausted for the purposes of habeas review, was addressed solely by

At the outset of this final part of discussion, the Court notes a substantial incongruence between Petitioner's claims presented to the state courts and for this Court's habeas review. Specifically, in his Ground Seven raised here, Petitioner lumps together five challenges, stating

> [(1) Fetky] failed to fully investigate [Petitioner's] alibi and present it at trial. Alibi witnesses [D]awn Kampf would have testified at trial that defendant Wallace was with her at the Don Juan Studios in Brooklyn, New York, on the night of the robbery.  [(2) Fetky] failed to check the criminal background of the accuser who [Petitioner] contends was a known drug dealer.  [(3) Fetky] failed to contact two of [Petitioner's] alibi witnesses [presumably, McCain and Moody,] even though the [Petitioner now alleges that he] supplied counsel with the name, address and telephone numbers of these witnesses.  [(4) Fetky] failed to consult with [Petitioner] in a meaningful manner.  [(5) Fetky] failed to properly advise [Petitioner] during trial of any plea-bargaining.

(Pet. at 19).

However, only two of these challenges were presented to the state courts.  In his pro se PCR brief, Petitioner asserted that Fetky was ineffective for failure to investigate Tursty's alleged being a "known drug-dealer," (D.E. No. 12-1 at 3), and – in his counseled PCR brief – Petitioner asserted Fetky's failure to investigate and present Kampf's testimony.  (D.E. No. 12-7 at 11) ("Defense counsel provided ineffective assistance of counsel by failing to fully investigate Petitioners alibi and present it at trial. . . . Petitioner's alibi was that he was at Don Juan's Recording Studio in Brooklyn during the evening hours of January 6 to 7, 2003.  Post-conviction relief investigation has discovered a witness [Kampf] who confirms the alibi").  No challenges based on potential testimonies of McCain or Moody were raised, same as no "failure to consult in a meaningful manner" or "failure to properly advise about plea-bargaining" claims were ever mentioned.

### a.      *Raised Challenges*

----

the Appellate Division.

Addressing Petitioner's challenges, the Appellate Division observed:

[As to Petitioner's claim that Fetky unduly omitted to investigate Tursty's alleged "drug-dealer" status, Petitioner] has offered no evidence that Tursty had a criminal record . . . . [As to Petitioner's claim that Fetky ignored Petitioner's alibi's information about him being with Kampf at the night at issue,] the judge found . . . credible Fetky's testimony that he would not have neglected to pursue a defense as important as an alibi defense, and that his failure to present such a defense must have been the result of [Petitioner's] failure to provide him with sufficient evidence to perfect the claim through reasonable investigation.  We give deference to such findings when supported by adequate, substantial and credible evidence, as here . . . . [W]e also agree with the judge's legal conclusion that <u>Strickland</u>'s standards were not met in this case.

<u>Wallace-II</u>, 2009 WL 790527, at *3 n.1, *7.

With respect to these challenges, the Court's analysis is substantively the same as that conducted with regard to Petitioner's Ground Six.  Here, Petitioner did not present this Court with any *verified* information, or *any* information at all, that Tursty had a criminal record allowing Fetky to mount a credibility attack on Tursty.  All Petitioner asserts is that Tursty was "known" as a "drug-dealer."  However, such evidence could not have been validly proffered by Fetky even if Fetky could find persons willing to express this opinion.  Hence, it was facially reasonable for Fetky not to pursue the investigation which could not bear a viable fruit.  Thus, Petitioner's challenge based on the rumors that Tursty was a "known drug-dealer" cannot pass muster even under the first <u>Strickland</u> prong and will be dismissed for failure to amount to a colorable claim.

Petitioner's position as to his argument that Fetky was ineffective by failing to investigate and present Kampf's testimony fares no better.  The state courts found, as a factual matter, that Kampf's testimony (as to what she could have stated during Petitioner's trial had she been called) not credible.  The same factual finding was made with regard to Petitioner's own and Petitioner's

mother's testimonies.   Hence, unless Petitioner presents this Court with clear and convincing evidence that the state court's factual findings as to credibility were erroneous, these factual findings cannot be disturbed by this Court on collateral review.   See Stevens, 295 F.3d at 368; Werts, 228 F.3d at 196.

Here, Petitioner offers the Court no evidence of any kind; this silence, in turn, leads the Court to believe that Petitioner relies on the record, as accrued.  The record, however, is replete with incongruities within – and between – Kampf's testimony, Petitioner's testimony and Petitioner's mother's testimony.   Indeed, Kampf's statements that she was "just waiting to receive something in the mail," or that she did not want to "get involved in legal matters," or that she did not reach out to Fetky (whom she actually knew from prior legal representations), or that she kept dating Petitioner for months but, somehow, presumed that Petitioner's armed robbery prosecution was not serious (despite of Kampf having a criminal record on her own) – all of that renders the state court's factual finding as to lack of Kampf's credibility solidly based.  The same applies to the state court's factual findings as to Petitioner's mother who, apparently, could neither (a) recall whether she learned of Petitioner's alleged alibi from Kampf or from Petitioner, nor even (b) bother to mention this so-very-important alibi to Fetky, all despite her being in constant contact with Fetky.

Finally, Petitioner's testimony, laden with: (a) his incongruent claims about his extensive driving experience and driving a car only once for a test-drive, about him never owning a motor vehicle and about him owning a car; (b) analogously incongruent claims about him never having any nick-name but "Fabbulous" and him still having another nick-name, "bubbleous," and his assertion that this peculiar nick-name was, nonetheless, way too common for his taste, while the

36

word "Fabulous" was, apparently, so unique to qualify as an unusual nick-name; (c) the incongruence in his claims as to the date of Petitioner's fight with Kampf; (d) the oddity of his claim that the break-up was, allegedly, based on jealousy of his child's mother, offered in conjunction with his statement that he brought Kampf, his new girlfriend, to spend the night with him in the very apartment that belonged to the mother of his child; (e) Petitioner's alleged inability to call his alibi witnesses from the prison and his even more inexplicable inability to call his witnesses after making bail – for many months; (f) Petitioner's inexplicable unwillingness to bring Kampf to Fetky, whom Kampf knew, and even more inexplicable unwillingness to ask Kampf to contact Fetky about the issue upon which his freedom depended (as well Petitioner's inability to explain when Kapf's travel to Canada worked itself into the picture, and how could Petitioner possibly learn of this travel if he actually stopped his contacts with Kampf when she got herself "another boyfriend"); (g) Petitioner's puzzling testimony that his witnesses declined to contact Fetky because, as "New Yorkers," they "did not like New Jersey," – all these aspects of Petitioner's testimony suggests that the trial court's factual finding (as to lack of credibility with regard to Petitioner's PCR testimony) was well rooted in evidence.

Consequently, this Court will not disturb the state court's factual determination that "Fetky's testimony that he would not have neglected to pursue a defense as important as an alibi defense [was credible], and [Fetky's] failure to present such a defense must have been the result of [Petitioner's] failure to provide him with sufficient evidence to perfect the claim through reasonable investigation." Wallace-II, 2009 WL 790527, at *7. Petitioner's challenges fail to meet even the first prong of Strickland since it was reasonable of Fetky to omit chasing the theory with regard to which Petitioner failed to furnish Fetky with the building blocks necessary

to perfect such theory. Therefore, Petitioner's two duly exhausted points incorporated in his Ground Seven will be dismissed, since the state court's findings were not an unreasonable application of Supreme Court precedent.

### b. *Newly Added Challenges*

Petitioner's remaining three challenges warrant little discussion.

Petitioner's challenges based on Fetky's alleged failure to investigate the testimonies of Moody and McCain cannot meet even the first prong of <u>Strickland</u> since Plaintiff offered this Court no affidavit of Moody (or of Plaintiff's "best friend" McCain) as to what these men would have testified to. Without such proffer, Petitioner's challenges present solely a self-serving conjecture: same as Petitioner's self-serving statement that he provided Fetky with these men's contact information and identified them as his alibi witnesses.

Having no facts of Petitioner's actual offering of this information to Fetky and no information as to what Moody and/or McCain would have testified to, this Court cannot conclude that: (a) it was "below an objective standard of reasonableness" for Fetky not to contact these men (whose very existence might have not been disclosed by Petitioner to Fetky), or (b) there is a reasonable probability that, had the "we-don't-know-what-they-would-say" testimonies of these men been presented, the jurors would have had a reasonable doubt respecting Petitioner's guilt. Consequently, these challenges fail to state even a colorable claim.

The same applies to Petitioner's next expression of displeasure with Fetky's performance. While Petitioner asserts that Fetky "fail[ed] to consult [Petitioner] in a meaningful manner," this allegation is not based on any facts offered for this Court's review. Moreover, the record reveals that, prior to trial, Fetky had eight conferences with Petitioner. <u>See</u> <u>Wallace-II</u>, 2009 WL

790527, at *5.   Petitioner's self-serving opinion that the amount (and/or the content) of these conferences was not meaningful enough to meet Petitioner's preferences does not indicate that Fetky's conduct fell below an objective standard of reasonableness.   Therefore, same as Petitioner's exhausted assistance-of-counsel challenges, this allegation fails to meet even the first prong of Strickland and will be dismissed for failure to amount to even a colorable claim.

Finally, Petitioner's assertion that Fetky failed to properly advice him about plea-bargaining is based on a non-substantiated by any evidence conjecture that "a" plea must have been offered at all (and the Court has no basis to presume that any plea was declined by Petitioner on the basis of deficient guidance provided by Fetky).   Having no evidence that Petitioner was offered and willing to accept a particular plea but was advised by Fetky to decline it (or was provided with a deficient guidance), the Court cannot find Fetky's assistance in violation of the Sixth Amendment guarantees.   See, e.g., Williams v. Jones, 571 F.3d 1086, 1093 (10th Cir. 2009) ("[A] defendant . . . may be entitled to a remedy [only] if . . . but for his lawyer's advice, he would have taken the plea offer.   This rule is derived from Strickland and Hill[ v. Lockhart, 474 U.S. 52, 56 (1985)]) (citations omitted).   Thus, this final aspect of Petitioner's Ground Seven will also be dismissed for failure to amount to a colorable claim.

V.      **CERTIFICATE OF APPEALABILITY**

The Court denies Petitioner a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).   See Miller-El v. Cockrell, 537 U.S. 322 (2003).

**VI.**    <u>**CONCLUSION**</u>

Based on the foregoing, the Court will dismiss the Petition with prejudice and will decline to issue a certificate of appealability under 28 U.S.C. § 2253(c).  An appropriate Order accompanies this Opinion.

_s/ Esther Salas_
**Esther Salas**
**United States District Judge**

Dated: April 2, 2013